We'll go to the last case, Hammer v. Sorensen. Mr. Turkel? Yes, sir. Chief Judge Pryor, Judge Rosenbaum, and Judge Moore, Ken Turkel, and it's my privilege to be here today on behalf of Marion Hammer. The district court erred in this case in finding that these emails containing graphic images of Ms. Hammer's personal email were protected speech. Let's say we don't even have to get to that. The district court also said this was not tortious. And then went on to say that even if it were, it wouldn't violate the First Amendment. It's not clear to me that what you're complaining about here would be tortious under state law. Um, Judge, the language in the order that referred to that one, it's literally subsumed within one sentence, I believe. And it's very difficult from the district court's order to understand whether that's some sort of an independent analysis of elemental pleading or whether the both of those are arguments were made. And right. Yes, the arguments were made, but the analysis on it is sort of look, it's a really short order. I know. I mean, yeah, I mean, sometimes district courts do that. No, but but the order seemed to be pretty clear. Look, this isn't tortious. And even if it were, it would if it would court said, right. I would. The district court said that, Judge, I'd reverse the order because the First Amendment analysis occupied the front half. Well, I'm asking you to reverse the order back. And I mean, we don't we don't need to reach an unnecessary constitutional question. Yes. Your complaint fails to allege a violation of state law. Correct. Your Honor, I think that when you look at and we certainly briefed this issue, but when Judge Hinkle found at the front end of the order that this was conduct and to use the exact words of the order, sending unsolicited these unsolicited to anyone, even a public figure who advocates gun rights was inappropriate, indeed, disgusting. And then the more operative language at the bottom of that paragraph is or at least how people should treat those with whom they disagree. Emails like this should not be sent in a civilized society. So, Your Honor, in a vacuum, just as to, for instance, the intentional infliction claim, that language mirrors one of the linchpin elements of intentional infliction. It's difficult to understand how Judge Hinkle could find that this was inappropriate, disgusting and emails that should not be sent in a civilized society when that's the exact standard, for instance, on that one particular state law claim. And then you could think that something is disgusting and and not something that that, you know, polite people in civilized society do. And it's not necessarily necessarily satisfy the standard of being beyond the pale of decency to support a claim for intentional infliction of emotional distress. I agree with you in part, Judge, but it's difficult to glean when that finding is made from the face of the pleading and the exact words are used and they match up with that particular element. It's somewhat difficult to pull away from that, that the district court wasn't aware that that is one of the elements. And equally, Your Honor, I mean, you agree with me, something could be gross or disturbing, but not utterly intolerable, not not so beyond all possible bounds of decency has to be utterly intolerable. Correct, Judge, but equally speaking, the court ignored the concept of the I'll call them the right to be let alone cases emanating from Rowan forward. Right. Which makes it very clear from the Supreme Court that you have a right in your house. It's been extended to email. It's been extended to flyers and regular mail to be let. And I don't think we're talking about. No, we now we own a different theory. I mean, there are claims here for intentional infliction of emotional distress and then intrusion upon seclusion. Is that what you're arguing about now is intrusion upon seclusion? Yes, Judge. And we also have the statutory claims, obviously. And if as you read the district court's order and going up to this conclusion, it wasn't tortious. It seems from the language of the short order that what the district court focused on was whether they were threatening, almost like the comparison that was being made was, are we being asked to are we being asked to regulate civility or are these threatening? And that's the only way the conduct can become tortious. And that's just not what the cases say. Well, they have to be highly offensive, right? Well, it depends on which which claim we're talking about. I know. I thought we intrusion upon seclusion. They have to be that they have to be highly offensive, right? Judge, I've tried intrusion upon seclusion cases. I don't know if highly offensive. I can agree for the purposes of argument. Goddard versus Wolfhard. Case says that that language, doesn't it? Yes, Judge. But again, there's a recognition here that these are something that shouldn't be tolerated in a civilized society, which is a fairly high standard. I mean, IED claims are hard to prove for that very reason. And yet we have this recognition by the district court that this is in conduct we should tolerate in a civilized society, which I think for the court to come out and say that, knowing that it matches up with that that if it's not threatening, it's not tortious. And that's just not what the law says. I mean, it doesn't have to be threatening. And in and of itself, there's pretty good authority, Your Honor. And we briefed this for the idea that whereas the court can resolve the First Amendment aspect of this is a pure question of law. The idea of whether this is threatening or idea that relate to the intent of it, et cetera, aren't necessarily questions that the court can resolve as a matter of law in the non-constitutional, non-First Amendment, regular elemental sort of framework. And it's difficult from this order, Your Honor, to even know whether that was what the district court did here. Here's the thing. The district court, I think, was clear enough that it was basing its decision both on the complaint failing to stay a claim under state law. And even if it did, as an alternative holding, that it would violate the First Amendment. We're here on de novo review. We can look at the complaint ourselves and what arguments were made for its dismissal. And to me, I don't know that we even have to get to the First Amendment. Judge, the state law cases that would govern the district court's analysis, for instance, of the common law tort claims, one of the cases, Thoma v. O'Neill, which is a fourth district case in Florida from 2015, was very factually similar. It was a flyer case. The court noted that you can't and don't have to focus on whether the flyer was a true threat of physical or emotional harm and pivoted to these cases that you're allowed to prohibit intrusion of the privacy of your home for unwelcome views and ideas. The content of the conduct, when you talk about intrusion upon seclusion, and if you look at some of the cases, I think certainly, given the court would have been able to support dismissing, at least on cases like Thoma and some of the other cases we had cited. And in Thoma, the court specifically said that our Supreme Court and the U.S. Supreme Court recognizes there's no First Amendment protection for speech and intrusion on the privacy of the home. Getting past the First Amendment, there was still a viable claim there is no less offensive than this. And equally speaking, Your Honor, the concept of someone being captive in their home, messages being forced to them in a way that they have no choice but to hear them over and over again has been found. Let me stop you there for a second. Yes. These messages were sent to her email address that she publicly advertises on the Florida lobbyist website. Is that fair to say? Judge, I would say it's publicly available. I don't like the use of the word advertise because it implies that it's being used for some sort of commercial purpose. Post it for public availability. Let's just think of advertisement and the broadest theory in answering Judge Rosenbaum's question. Yes. And the fact that she happened to her house does not make it an intrusion of her house. How do you get to that? How do you equate those two when a reasonable person sending it to a publicly announced website or a public? I guess the website is announced for the purpose of allowing people to know how to contact the lobbyist who tried to influence the lawmakers on these topics. How do you get to the part where she was a captive audience in her own house and her home privacy was invaded? Judge, first of all, there's no functional difference under any of the case law between someone being able to obtain a private address of anyone, a judge, me, anyone, and send them a mailing that would otherwise constitute tortious conduct. Um, I guess we're having a fundamental disagreement about whether it's a private address. I mean, it seems to me that it's her worksite address and particularly in today's world where, you know, people send things from all over. And in this particular case, he was from California. This is how people reach each other is by email. It was sent to her work, to her work email. I mean, that's the address that is advertised as her lobbyist address. It wasn't sent to some personal email that has no association with her lobbying. There, there is, there's one email and only one email. Uh, it was certainly at the time of this available publicly, but judge, if the court would look at the, the shirt lift case, which, uh, granted it's a Utah district court case, but it does cite to Frisbee Rowan in the Seminole Supreme court cases, they extended emails, um, to, to, they extended, which I said, they extended the analysis to emails in a way that doesn't distinguish between emails and regular mails. Judge, in a very philosophical sense, when someone gets an email today, let me ask you about shirtless. I mean, in shirtless, what was happening there was, uh, weren't the members of a trade association broadcasting sexually explicit material into homes? Well, in part, some of the material, yes, judge, not all of it, but there was certainly material. It seems to me that that is very different from sending an email to the publicly and now lobbyist work address of somebody email ad. Judge, why is it not? It's very, it's very distinguishable. First off, um, in, in shirt lift, the court recognized very strongly the Supreme court's, um, uh, constant and consistent holding. We have a right to be left alone. My client is a private actor. She is not a government forum. This was not public speech in a public place with numerous people engaged in some vigorous debate over public issues. This was one actor sending another private person, a gory picture or gory pictures of mutilated bodies with no discussion about public issues and so on and so forth. What's interesting about isn't it true that she's described herself as the most well-known lobbyist on behalf of the NRA? Yes, judge. She does. Okay. And that's the words. I mean, I mean, look, I'm not in any way taking a position on the emails other than to say that it seems to me that it says, let's say the first email says, um, thought you should see a few photos of handiwork of the assault rifles you support. I mean, that is, he's saying specifically that he's addressing that what she is lobbying, right? The assault rifles you support, meaning the assault rifles you are lobbying for with respect to regulations for or against. Isn't that a fair way to see through that? Okay. It's a cryptic note, judge. I do not think that the district court or any of us can know because we didn't get to a point where we could ask, but from a first amendment perspective, the content in and of itself, um, doesn't drive the fact that we have a right to be free from unwanted communication. And in short, if you're on it, the court even said, even in cases involving core political speech, I'm sorry. How, if he wanted to talk to her about his views of whether assault rifles should be regulated, how would he reach her? What would be the way he would do that? Judge, we have, as a country celebrated any number of public forums, government designated public. I'm asking you, what would be the way that he should reach her? He could certainly, if he wanted to have a discussion, he could certainly email her. He's got social media, but he's not, it's not, it's not an allegation on her, uh, for instance, to like, a legislator who's got an obligation to open up a conduit to his constituents for that dialogue. She is a private. So let me just, I'm sorry, is your argument that he shouldn't be able to talk to her about this? Because that's what it sounds like you're saying, or is it that he should be able to talk to her about this, but he shouldn't have done it through the email. He should have done it some other way. No judge. Then what is the other way he should have done it? Judge, I don't think you can answer that. You're well over your time, well over, uh, and, and, and then we'll save your time for rebuttal. Thank you, Your Honor. Go ahead and answer. Yeah. Let me ask that question. Judge, he has absolutely no right to send a private email to a private person any more than he would have a right to send a private letter to someone with content that they didn't want intruding in their mailbox. And she has absolutely no obligation to accept it without. Okay. I think we under, I think we understand your point. Um, thank you, Mr. Finley. Yes, sir. Uh, may it please the court. My name is Tom Finley. I represent, uh, the appellee Lawrence Sorenson. Uh, let me start where the court started in his questioning of Mr. Turkle. Uh, I think that the, what the trial court did, Judge Hinkle did was to, uh, find as a matter of law that these claims were not, were quote, not tortious end in the inquiry. Uh, Florida law has an incredibly high standard for the tort of intentional infliction of emotional distress. Whether conduct is outrageous enough is a question of law per the Liberty Mutual v. Stedman case. Uh, the standard is that the conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. Uh, the Kim case says that it must be so, the emotional distress must be so intense or so long lasting that no reasonable person can be expected to endure it. Uh, as was pointed out in the, in the opening argument, uh, this, and, and it's stipulated, it's accepting the four corners of the plaintiff's complaint to be true. There are only two email within one half hour of each other. Uh, and, and I, I would note also that in terms of the context, these came, uh, in the wake of the Parkland shootings, which are referred to 10 times in the plaintiff's complaint. Mr. Sorenson sends these, uh, messages with his address and his correct name and therefore his email address to her and says, dear Ms. Hammer thought you should see a few photos of handiwork of the assault rifles you support. Less than a half hour later, he follows up and says, this photo documents the effect of an outdated military rifle on JFK. Today's assault rifles are far more destructive. So I think the court, uh, is following the right line of thinking in, in agreeing with judge Hinkle that these, uh, comments are not so outrageous in this context as to, uh, set forth a tort, which is a question of law. With respect to the intrusion upon seclusion claims, you get to the same place, uh, in terms of the level of outrageousness. If you look at the Oppenheim case, which is a middle district of Florida case in 2010, construing Florida law, it likened the burden for, uh, the intrusion, uh, for intrusion of seclusion tort to be similar to that for intentional inflection of emotional distress. So we end up at the same place. And as the court mentioned, uh, Stoddard versus Wohlfahrt, a Florida case that held an invasion of a privacy claim should be dismissed based on two telephone calls, which were much more intrusive and much worse than what we have in this case when the person said, you're mine. And then another phone call inviting the recipient to, to perform a sexual act. That is the level of, of proof or pleading that is necessary to allege those torts. And we don't think that, uh, the plaintiff has come close in this case. We should really even reach the first amendment question. Should we counsel? I mean, it seems to me that for us to reach it, we would be half having to conclude that these state common law claims, uh, in, in Florida, um, somehow violate the federal constitution. Uh, and, and, and if, if the complaint fails to allege claims under state law and we can avoid that constitutional question, isn't that the more appropriate way to dispose of this appeal? Yes, I, I agree with that. Um, I think if the court were to, uh, go beyond that, that the Snyder case is very significant and our case is even stronger than the Snyder case, because here we're dealing with a public figure. There's no question that the plaintiff has acknowledged that she is a well-respected second amendment lobbyist. And of course, that's a natural place for one that wants to speak about this issue to go to such person. And, uh, the Snyder case to the Supreme Court said that you have to look at the speech itself and see if it's a public concern. There was a private speaker also in the Snyder case. And, but whether it's a matter of public concern is determined by the comments. And that includes the context, the form, and the content here, the content. I'm just very confused about why, why it is, but when I asked you a question of, of why we should avoid the first amendment, you've, you've now told me how the person. Well, I was trying to transition. I tried to answer the question by saying, yes, emphatically, yes, you could decide this case without ever reaching the constitutional analysis, uh, but you know how lawyers are. And, and so I think it's so, uh, protective of, of this right that, uh, and it did, uh, relate to intentional infliction of emotional distress and invasion of privacy claims. Uh, but I, I do agree that it is a question of law. Florida standard is extremely high. The level of outrageousness can't be met by this communication with the lobbyist in a polite manner. The pictures are gruesome, but sometimes that's what some people think is useful to convey their point. Um, if the court doesn't have any more questions, then I'll conclude my argument. Okay. Um, I don't hear any questions. Um, so we'll then, um, here's some rebuttal, uh, from Mr. Turkle. Yes, judge. Um, for, for a moment there, he had, uh, opposing counsel had walked back into the constitutional argument. I understand. I think I understand. You don't want to hear that. Um, at this point, but I, well, you can argue what you want. I, it just seemed to me to be pretty clear that we don't have to reach that question if the state law claims fail as a matter of law. And, uh, he agreed with. Yeah, I would point out that Falwell Sullivan Schneider, they're all public forum cases, but I judge where it becomes difficult to argue is when the district court recognizes that this conduct rose to a level of being not the conduct we tolerate in a civilized society. And there's, there's, um, there's difficulty understanding how at least that plausibly recognizes, uh, just with the intentional infliction claim alone. I mean, just look at Florida cases, uh, where the Florida Supreme court and appellate courts have complaints, alleging those kinds of torts. Um, it's, it's, it's not hard to find a lot of cases that look like the courts have tolerated more outrageous allegations than what we have here. Judge part of that. And we may be drifting a little here, but would be at least the way we see this. He sends these emails with multiple graphic pictures, pictures of president Kennedy's head blown wide open picture of a leg decimated by a bullet wound. And the response to why it wasn't tortious was I was engaged. I was trying to instruct her. I was trying to educate her with these cryptic, bizarre captions. And we believe in that respect, if we're going to be in a sort of regular plausibility, uh, you know, elemental kind of analysis that we have a right to discovery on that because intent does matter. Judge, we have a right to ask why were they really set for the reason they're saying that the idea that these pictures, you don't need to get discovery. If it, if, if what you have alleged though, is just not extreme enough, just in the Thoma case, uh, which I mentioned earlier, similar facts, probably facts that I can make a pretty good argument to may even be less offensive than this. The court recognized a viable claim past the constitution and on the elements affirming an injunction under a cyber harassment statute and intrusion upon seclusion. Um, and when, when you read the analysis of that case, yes, the conduct's a little different. We're dealing with mailers, but beyond that, it's very similar. Um, it is similar in the sense that the conduct viscerally is no more shocking, uh, than this or less shocking, even it would be my argument, but subject to some sort of subjective debate on that. But, you know, in that respect, we look at this order and I understand the remaining, thank you. This could be analyzed de novo, but if we look at the Thoma case to me to be a very good indication, um, look in a vacuum here, we had a private actor sent another private person, gory, disgusting pictures for no obvious reason at all. And in that respect, judge, if what this hinges on is, did we state a plausible claim? We believe elementally there's plenty of facts pled that this should be, uh, reversed on that ground. As to the constitutional grounds, we would just echo what we've said in our papers all along, Falwell, Sullivan, Snyder. They're just completely in opposite cases. They're all public forum, viable public forum cases. One thing judge Hinkle did not do. And I'll end with this in, in, in, in to a degree, I think it dovetails with this. It's not tortious, uh, finding in, in, in opposing council touched on a little bit, but the method, the mode, the place, everything, all of the trial court looked at was, is it threatening or is this just uncivil judge? We think it's far beyond uncivil. We think we've pled these claims and we'd ask that you reverse the trial court's order to smithing. Okay. Um, Mr. Kirkle, thank you. Um, we have your case, um, and we will be in recess until tomorrow morning. Thank you, your honor.